**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 25-CR-95 |
| ROBERT J. SCOFIELD, | Hon. Leonie M. Brinkema |
| Defendant. | Sentencing Oct. 21, 2025 |

## RORBERT SCOFIELD'S MEMORANDUM IN AID OF SENTENCING

Robert Scofield's actions at the CIA on March 19th of this year – pointing the firearm at the ground and not at any of the cars passing him from behind, and shooting only a few bullets at the ground for only a few moments before calmly walking away – were all consistent with attempting to make sure no one was hurt. That his next steps were to train the firearm to his own temple, where he would keep it for the next several hours, confirm that Mr. Scofield brought a loaded firearm to the CIA and shot it at the ground as a cry for help, and nothing more. Still, he acknowledges that his offense was very serious. No matter what he believed was happening to him, and how badly he wanted help, he understands that his way of seeking it was frightening and potentially dangerous.

Thanks to the steps Mr. Scofield took, no one *was* hurt, and this is mitigating. So, too, is the *reason* that Mr. Scofield was seeking help. Specifically, as reflected in his actions and statements that day in March, the PSR, letters of support submitted to the Court, and his own letter to the Court, Mr. Scofield is burdened with recurring delusions that someone or multiple people within the CIA are invading his thoughts and/or following and abusing him. The various sources before the Court reflect that the strength and persistence of these beliefs ebb and flow, and that most around him – and Mr. Scofield himself – see a marked increase in the months after he returns to a substance use disorder that has also plagued him since he was a young adult. Triggers may also include stressful or traumatic events, and of course substance use disorder and trauma reinforce each other.

Two years before Mr. Scofield's March 2025 trip from the Pacific Northwest to Virginia and the CIA, he lost his residence in a sober living house because it closed, he lost his health insurance and with it access to the psychiatrist he had been seeing for two years, and he relapsed. Not long afterwards, he resumed sending online messages to the CIA that had ceased two years earlier. In the months leading up to the March trip, he lost one of his few close friends to a tragic car accident, suffered an overdose, allegedly shot at the ground near a hotel Oregon in the belief that CIA officials were following him but that police would not help, and was briefly arrested and incarcerated. He was released from a local jail shortly after that incident, and without mental health or substance use treatment in place.

The proposed sentence takes all of the above into account by recommending a combination of a period of carceral punishment and a plan to promote a gradual and treatment-focused reentry into the community.

For the reasons that follow, Robert J. Scofield, through undersigned counsel, hereby respectfully requests that the Court sentence Mr. Scofield to serve 12 months and one day in prison, to be followed by a three year period of supervised release subject to the special condition that he reside in the Bureau of Prisons halfway house in Oregon, the Northwest Regional Reentry Center, for the first three months of his term of supervised release, as well as the special conditions proposed by the government (ECF 42).

3

I.    **The Court must impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing, and the guideline range is only one of many factors the Court must consider.**

Mr. Scofield has no objection to the calculation of the guideline range applicable to this case in the Draft Presentence Report (PSR), which is 27 to 33 months of incarceration, followed by at least one year and no more than three years of supervised release.[1]

But it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The Court must keep in mind that, as the Department of Justice recently noted, determining the Guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Gov't Supp. & Amend. Sent. Mem., *United States v. Stone*, Case No. 19-cr-18-ABJ, Dkt. No. No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors); *see also Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007),

As the Court explained in *Nelson*, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."

---

[1] The maximum penalty for the offense is five years of incarceration and three years of supervised release.

555 U.S. at 352. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth in 18 U.S.C. § 3553(a), a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005).

## II.    The proposed sentence will be sufficient but not greater than necessary to achieve the goals of sentencing.

The balance of the factors in § 3553 support the conclusion that a sentence of 12 months and a day of incarceration followed by three years of supervised release, the first three months of which to be served in a halfway house, will be sufficient but not greater than necessary to achieve the goals of sentencing in this case.

A.    *Mr. Scofield's history and characteristics are mitigating, and also provide reason to expect that the proposed sentence will be sufficient to deter him and protect the public.*

1.    <u>Mr. Scofield's upbringing, while not marked by extreme hardship, was nonetheless shaped by periods of instability and isolation.</u>

Mr. Scofield was born in Oregon, where he has resided his entire life. For the majority of his childhood, he was raised in a home with his biological parents and four older half-siblings. █████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

          ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Looking back on his younger years, he describes himself as a "loner" in elementary school. PSR at ¶55. His parents divorced when he was a teenager after his mother had an affair, which further impacted his already-unsettled family life. Mr. Scofield internalized the feelings of betrayal from his mother's infidelity, and their relationship was significantly damaged. He did not speak to his mother for four years. PSR at ¶54. These environmental factors left Mr. Scofield with unaddressed feelings of chronic depression and anxiety. Despite these challenges, Mr. Scofield's parents after years of reconciliation with him ██████████ ████████████████, now serve as pillars of support.

6

> 2.    <u>Mr. Scofield began to self-medicate using various substances to mitigate chronic feelings of anxiety and depression.</u>

Mr. Scofield did not engage in substance use until he was a late teenager after his parents' divorce, but the illicit substances were so effective at calming his undiagnosed mental health symptoms that he rapidly became addicted. He first tried marijuana at the age of 17, and it quickly became a daily habit. When he was 19 years old, he started to use cocaine, methamphetamines, and benzodiazepines daily as well. Over the next several years, Mr. Scofield's substance use increased and diversified to include hallucinogens, alcohol, and fentanyl. PSR at ¶63. Family members reported a significant change in his demeanor coinciding with the initiation of substance use. His stepmother described him as previously having been focused, good in school, and active; however, these qualities diminished as his substance use disorder progressed. Letter of Tami Nelson, included in Exhibit 1.

When Mr. Scofield was 23 years old, he had a traumatic amputation of his left hand from a work-related injury involving a wood saw. His hand was successfully re-attached, but he lost his left thumb in the process. Following this surgery, he was prescribed oxycodone for pain management. PSR at ¶58. Given his pre-existing struggles with substance use, the introduction of an opioid medication likely exacerbated his underling challenges with addiction. After the complicated surgical procedures and rehabilitation, Mr. Scofield experienced general feelings of worry regarding lack of opportunity. This increase in anxiety fueled an escalation of substance use.

In an attempt to self-medicate his escalating anxiety and depression, Mr. Scofield's substance use became erratic, uncontrollable, and life-threatening. In 2020, he was admitted to the emergency department after suffering a potentially opioid-use-induced seizure. PSR at ¶58. His most recent fentanyl overdose took place shortly after his friend died in December of 2024 and shortly before he was arrested in Oregon on January 30th, when he was discovered in an incoherent state by his roommate on the floor of their shared apartment in Oregon. PSR at ¶¶ 47, 55, 62.

4.     <u>Despite the difficulties Mr. Scofield faced regarding his mental
health and substance use, he still made focused efforts to attend
treatment and maintain long periods of sobriety.</u>

Between the years 2019 and 2025, Mr. Scofield received care in various ways
addressing his substance use and mental health struggles. Mr. Scofield's treatment
has not been strictly consistent, but it is clearly intentional and persistent, showing
motivation to improve his mental health.

Starting in 2019, Mr. Scofield entered alcohol and drug related treatment as a
requirement for his previous DUI charge. He struggled in this program and was
unable to complete treatment. PSR at ¶40. After his brief hospitalization in 2021, he
entered a sober living halfway house in Salem, Oregon and began attending multiple
Narcotics Anonymous meetings each week. PSR at ¶63. While in the sober living
house, he returned to treatment for his previous DUI charge and enrolled in classes
at a community college. PSR at ¶¶65-67. Mr. Scofield's stability while living at the
halfway house is demonstrative of who he is capable of being while sober and
supported. He was engaged in treatment for his substance use disorder, taking
responsibility for his past legal involvement, and pursuing his education. During this
time, he did not pick up any new charges. He was also engaged in regular therapy
and medication management with his previous psychiatrist during this period. PSR
at ¶62.

In 2023, the sober living home was sold and shut down, and Mr. Scofield was
left without the community that had supported him in his sobriety since 2021. Around
the same time, he also lost his health insurance. PSR ¶¶ 62, 63. Unfortunately, as is

inherent in the disease of addiction, Mr. Scofield relapsed. He fell into an addiction spiral of using marijuana, alcohol, cocaine, and benzodiazepines. PSR at ¶63.

While currently incarcerated and sober, Mr. Scofield has taken advantage of all the resources offered to him. ███████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

Mr. Scofield, "[he] has been a regular attendee over the past couple of months. He is thoughtful and sincere in his words. After getting to know [Mr. Scofield] a little bit, I feel like he does not have a mean bone in his body. He talks about his family in Oregon. Robert is a kind person…." Letter of Brian Seery, included with Exhibit 2.

████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████ "he has maintained maximum privileges on the unit. He follows the directives of security staff…Mr. Scofield has been observed to have a positive relationship with peers." Letter of Anne Zalewski, included with Ex. 2. ████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██

His family members consistently express the view that his involvement with the criminal legal system stems from his struggles with substance use, which have exacerbated his mental health challenges and contributed to persecutory delusions. His stepmother explained, "I believe his criminal charges are because of his mental

health." Letter of Tami Nelson, included with Ex. 1. Notably, he has demonstrated meaningful progress while placed in the jail's mental health unit. This success suggests that, with continued treatment, stability, and sobriety, he has strong potential to avoid future reoffending.

> 5. <u>Mr. Scofield is grounded and understands that remaining sober is the only way forward.</u>

Thankfully, Mr. Scofield maintains the support of his family, who remain committed to his recovery. His father shared: "Our family is 100% behind him for getting the help he needs." Letter of Kevin Scofield, included with Ex. 1.

Mr. Scofield has various options to transition to the community in Oregon. One may be participating in the U.S. District of Oregon Reentry Court.[2] As noted in his letter to the Court, Mr. Scofield is interested in this program, but knowing that it might not be an option, he also took it upon himself to look for housing options in Oregon that will support him in his recovery; he recognizes that he will have more success in a sobriety-focused environment than if he were to live on his own. *See* Exhibit 3. He has been in contact with Iron Tribe Network, which owns and operates several sober living homes throughout the state of Oregon.[3] Living in an Iron Tribe

---

[2] The court's description of the program may be found at http://bit.ly/4940eQO (last visited 10/14/25), and the defense team conferred with District of Oregon Probation Officers familiar with the program. The Reentry Court is a very structured program designed to help individuals, who struggle with substance abuse, gain and maintain stability. Entry into the Reentry Court is entirely voluntary and cannot be court-ordered. Traditionally, participants are referred to observe the program while they are in the Northwest Regional Reentry Center, a federal halfway house in Portland, or once they are on supervision, and must apply for admission.

[3] The Iron Tribe Network's website provides more information at https://www.irontribenetwork.org/ (last visited 10/14/25). The defense team has also been in contact with a manager of Iron Tribe homes, who notes that while there are

home would allow him to return to school or seek employment while participating in a community, with an assigned weekly chore, required house meetings, and random weekly UAs.

 This progress is highly encouraging and suggests that, with continued sobriety and structured therapeutic support, Mr. Scofield has a strong potential for long-term recovery.

B.    *The proposed sentence would reflect the nature and circumstances of the offense, and promote the goals of sentencing.*

As already noted, Mr. Scofield's offense was serious. The government points out that it was not his first offense (given that he has convictions for driving under the influence, and distributing controlled substances). ECF 42 at 5. And the government emphasizes that he is alleged to have engaged in similar conduct a few months before coming to the CIA, in January of 2025, when he also allegedly discharged a firearm and also told officers that he was motivated by wanting help

---

not any immediate bed spaces in the county where Mr. Scofield is from, there are other beds available in nearby counties. Obtaining an available bed requires a simple phone intake once he returns to Oregon.

because CIA officials were tormenting him. *Id.; see* PSR ¶ 47.[4] Notwithstanding that Mr. Scofield has come to such offense conduct through a fog of a mental health condition that is not of his own making, and a substance use disorder that he has at least made significant efforts to conquer, the defense does not disagree that a significant amount of incarceration as punishment might promote deterrence and, with it, public safety. The defense proposal reflects this.

But not only must any carceral sentence as punishment take into consideration these latter factors, but also there is little reason to believe that more than twelve months and a day is necessary to achieve these goals. Such a sentence would be far longer than any sentence imposed on Mr. Scofield in the past. PSR ¶¶ 40-42 (reflecting that the longest custodial sentence he has incurred before now was five days). Further, Mr. Scofield was immediately detained for his actions at the CIA, whereupon he learned that pretrial release from federal court was never a realistic possibility given his actions at the CIA, *i.e.*, that, as a practical matter, such conduct will lead to incarceration. In short, the consequences for his actions at the CIA were swift and clear. As the National Institute of Justice has reported after reviewing available research, "for most individuals convicted of a crime, short to moderate

---

[4] As reflected in the PSR and documents in discovery, police reported that Mr. Scofield smelled of alcohol and reported drinking a great deal the night of this incident. Police also reported that he told officers that the reason he had fired a firearm in this incident was because the CIA had been following him, and that several calls to local police (which are documented) had produced no help. Police reported that he said that he had shot at the sky once but then shot only toward the ground and into a bush for fear of harming birds or others. And, as in March, he reported feeling suicidal that night as well. *See* PSR ¶ 47.

prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect."[5] On the other hand, "[e]ffective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration."[6]

Because Mr. Scofield will remain on federal supervision whenever he is released, the lessons he has learned through this prosecution will remain highly relevant – the threat of additional federal punishment for *any* violation of law while he is on supervised release should continue to provide ample deterrent effect.

On the other hand, federal supervision will also promote the goals of rehabilitation in a way that prior state sentences have not seemed to. As discussed above there is a U.S. District Court-run voluntary "Reentry Court" in Portland, Oregon. Mr. Scofield may eventually become eligible to participate in that program, and his letter to the Court expresses interest in it. *See* Ex. 3. But whether he is or is not, all agree that Mr. Scofield should be ordered to participate in some needed mental health and substance use treatment as a condition of supervised release. As he says in his letter, he welcomes this access (and the threat of incarceration for

---

[5] National Institute of Justice, *Five Things about Deterrence*, at 1 (June 5, 2016), *available at* http://bit.ly/476AwbX (last visited 10/14/25). "The National Institute of Justice (NIJ or the Institute) is the research, evaluation, and technology agency of the U.S. Department of Justice and is dedicated to improving knowledge and understanding of crime and justice issues through science." *Id.*

[6] *Id.* Note that Mr. Scofield is not eligible for any sentence reduction from the Residential Drug & Alcohol Program due to the nature of his conviction.

failure to comply with such treatment recommendations may provide additional motivation).

The defense proposes that the Court also order that Mr. Scofield reside in the Residential Reentry Center (or "federal halfway house") in Oregon for the first three months he is on supervised release, if he is eligible, for several reasons consistent with the goals in section 3583.

First, such a halfway house placement would provide certain and stable housing for Mr. Scofield as he reenters the community, begins his drug and mental health treatment in the community, and continues to search out other supportive housing (such as the sober living homes he has already begun to investigate), in addition to employment.[7]

Second, undersigned counsel understands that the knowledge that Mr. Scofield will have a fixed address in Oregon upon his release from incarceration would promote the United States Probation Office's consideration of an anticipated request from this district's Probation Office to transfer supervision to that district, which in turn would facilitate a transfer of this Court's jurisdiction to the District of Oregon.

Transfer of jurisdiction would be necessary in order for Mr. Scofield to be eligible to participate in the voluntary District of Oregon Reentry Court. And even if Mr. Scofield does not enter into that program, transferring jurisdiction would ensure that

---

[7] Such programs typically cannot project availability far in advance.

if Mr. Scofield does violate any of the many conditions of release to be imposed, a supervising court could swiftly react with appropriately-measured sanctions.

Finally, the defense hopes that the knowledge that Mr. Scofield is to reside in a certain Oregon residence upon release will improve the chances that the Bureau of Prisons will designate him to serve the carceral portion of his sentence at its Oregon prison, Sheridan FCI.[8] This in turn will allow Mr. Scofield to resolve his pending state case while incarcerated, should he opt to do that after consulting with his state court-appointed lawyer.[9] If he does not choose to resolve that case without a trial, his being in Oregon will facilitate Oregon's execution of the non-extraditable warrant pending against him, meeting a concern of the government's (and Mr. Scofield's, as he does not intend to let that case linger).[10]

With months away from drugs and related stressors, Mr. Scofield sees very clearly that his mental health will continue to worsen unless he takes action on his addiction, to paraphrase his letter. Ex. 3. His success in treatment in the past, his participation in treatment at the jail over the last few months, and his self-driven

---

[8] The defense understands that the Court cannot order the BOP to designate Mr. Scofield to Sheridan FCI, but the Bureau does prioritize designating individuals "within 500 miles of their release residence." *See* U.S. Bur. of Prisons, "Designations," website, at http://bit.ly/48uURdl (last visited 10/14/25) (summarizing policies).

[9] Undersigned counsel has conferred with Mr. Scofield's lawyer for the pending case, and she reported that staff at Sheridan FCI have facilitated inmates' participation in Oregon state court hearings by video in the past.

[10] Resolving that case could lead to the imposition of another sentence of incarceration, obviously. In that event, the defense expects that Mr. Scofield would be transferred to a state facility to serve such sentence before he begins his federal term of supervised release.

research into sober living facilities in recent weeks show that he is committed to obtaining the treatment.

Another factor in Mr. Scofield's life that suggests that the defense's plan is sufficient to promote the goals of sentencing is that Mr. Scofield will not be alone as he confronts the temptations of drug abuse again when he is released. As noted above, notwithstanding his difficult upbringing, and the challenge his own struggles have posed for his family, his friends and family remain supportive. Indeed, his parents are knowledgeable about both addiction *and* recovery. They can be counted on both to help him get on his feet when he is released, and to demand accountability from him.

Reading the letters of Mr. Scofield's family and friends highlights how much mental health and substance use disorder have transformed this young man. But the same letters, those from those within the local jail who have come to know him well in recent months, and his own letter also highlight how much of his light still remains in him. The proposed sentence will promote the goals of punishing and deterring Mr. Scofield from future offenses that put others at risk, without giving up on drawing that light all the way back out.

## CONCLUSION

For these reasons, and such others as may be advanced at the upcoming sentencing hearing, the defense respectfully requests that the Court impose no more than 12 months and a day of incarceration, and three years of supervised release, subject to standard conditions, the special conditions proposed by the government,

and the special condition that he reside at the halfway house in Oregon, Northwest Regional Reentry Center, Inc. for the first three months of his term of supervised release, unless he is not eligible to reside there.[11]

Further, the defense requests that the Court recommend that he be designated to serve his custodial sentence at FCI Sheridan, in Oregon.

Finally, the defense requests that the Court request that the District of Oregon accept jurisdiction over this case after sentencing.

Respectfully submitted on October 14, 2025.

**ROBERT J. SCOFIELD**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

by:_____s/_____
Ann Mason Rigby
VA Bar No. 92996
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org

---

[11] Having reviewed BOP policies and conferred with Probation Officers in the District of Oregon, the defense is not aware of any reason that Mr. Scofield would not be eligible to reside at this halfway house other than the pendency of a warrant, which is not expected to be an issue by the time that he is released to begin serving a term of supervised release, for the reasons discussed above.